**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| AMERICAN HISTORICAL ASSOCIATION, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, *et al.*, <br><br> Defendants. |

Civil Action No. 01-2447 (CKK)

**MEMORANDUM OPINION**
(September 24, 2005)

**I.      Introduction**

Presently before the Court is a dispute over the relationship between an executive order

issued by the president of the United States and a statute passed by Congress.  Plaintiffs have

asked the Court to find that the president has overstepped the limitations on his power by issuing

an executive order that alters the terms of a statute.  Plaintiffs[1] have sued the National Archives

_____

[1]Plaintiffs listed on the First Amended Complaint, filed July 2, 2004, are the American
Historical Association, a nonprofit organization founded "for the promotion of historical studies,
the collection and preservation of historical documents and artifacts, and the dissemination of
historical research," Stanley I. Kutler, Professor Emeritus of History and Law at the University of
Wisconsin, the National Security Archive, a nongovernmental research institute and library, the
Organization of American Historians, a nonprofit organization "devoted to promoting the study
and teaching of American history," Public Citizen, Inc., a public interest organization "dedicated
to protecting the rights of members of the public as both consumers and citizens," the Reporters
Committee for Freedom of the Press, a nonprofit "association of reporters and editors dedicated
to protecting freedom of the press," and the American Political Science Association, "the world's

and Records Administration ("NARA"), and the Archivist of the United States,[2] ("the

Government" or collectively, "Defendants"), seeking access to presidential records of former

President Ronald Reagan that they claim are being improperly withheld by the executive branch.

At issue is Executive Order 13,233, signed by President George W. Bush on November 1, 2001,

which purports to "further implement" the Presidential Records Act of 1978, 44 U.S.C. §§ 2201-

2207 (1991). In Count I of their First Amended Complaint ("Complaint"), Plaintiffs ask this

Court to find that Executive Order 13,233 constitutes an impermissible exercise of the executive

power, and to enjoin its implementation.  Compl. ¶¶ 66-73.  In Count II of their Complaint,

Plaintiffs ask the Court to order the release of specific documents that have been withheld,

initially under the terms of the Executive Order, but now under the incumbent president's

independent invocation of constitutional privilege.  Compl. ¶¶ 74-83.

The Court originally dismissed the instant suit on jurisdictional grounds.  *See Am.*

*Historical Ass'n v. Nat'l Archives and Records Admin.*, 310 F. Supp. 2d 216 (D.D.C. 2004)

(order granting motion to dismiss).  However, Plaintiffs subsequently filed a motion to alter or

amend the Court's ruling pursuant to Federal Rule of Civil Procedure 59(e), informing the Court

that material facts that were not apparent in the initial round of briefing impacted the Court's

grounds for dismissal.  Although Defendants argued that Court had reached the correct result,

---

largest professional organization for the study of politics."  First Am. Compl. ("Compl.") ¶¶ 3-9.

[2]At the time this suit was filed, John W. Carlin served as the eighth Archivist of the
United States.  In February 2005, Allen Weinstein became the ninth Archivist of the United
States, and consequently replaces Mr. Carlin as Defendant in this suit.  *See* NARA.gov,
Archivists of the United States, http://www.archives.gov/about/history/archivists/ (last visited
September 2, 2005).

Defendants did not dispute the facts as presented by Plaintiff.  Plaintiff also sought and was granted leave to amend the original complaint to include the additional claim disputing the application of the Executive Order to various documents.  In light of the relevant, though belatedly-presented facts, the Court shall grant Plaintiffs' Motion to Alter or Amend the Judgment.[3]  Having granted this motion, the Court will reconsider its earlier ruling on Plaintiffs' Count I in a separate Memorandum Opinion and Order.

The parties have filed cross motions for summary judgment with respect to Count II of Plaintiffs' Complaint ("Defs.' Mot. for Summ. J. Count II" and "Pls.' Mot. for Summ. J. Count II").  At issue are nine documents from President Reagan's presidency over which President Bush has now asserted constitutional privilege

After an examination of the parties' motions, the briefs, and the relevant law, the Court finds that Defendants' motion shall be granted and Plaintiffs' motion shall be denied.

## II.    Factual and Statutory Background

### A.    Historical Context

Prior to 1974, the wide array of materials generated during a presidency were generally considered the property of that president when his term ended, although those ownership rights might be limited somewhat by the public interest in them as records of government activity.  *See*

---

[3]Motions under Federal Rule of Civil Procedure 59(e) will be denied unless the district court finds "that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  *Firestone v. Firestone*, 76 F.2d 1205, 1208 (D.C. Cir. 1996) (internal quotations omitted).  A district court properly exercises its discretion under Rule 59(e) to alter or amend its judgment where "the moving party presents new facts or a clear error of law which compel a change in the court's ruling."  *New York v. United States*, 880 F. Supp. 37, 39 (D.D.C. 1995).

*Nixon v. Administrator of General Services*, 433 U.S. 425, 431 (1977); *Nixon v. United States*, 978 F.2d 1269, 1270 (D.C. Cir. 1992).  In the midst of the Watergate investigation, however, Congress passed the Presidential Recordings and Materials Act ("PRMA"), which transferred control of President Richard Nixon's presidential records to the Administrator of General Services (later changed to the "Archivist"), and directed the Administrator to develop regulations providing for public access to the materials.  *See* 44 U.S.C. § 2111 note.  The PRMA was upheld as constitutional in *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977).  Although the Court in *Nixon v. Administrator of General Services* held that there is a legal foundation for a former president's claim to executive privilege surviving his tenure in office, the Court also held that the former president's interest in keeping the records private erodes over time.  *Id.* at 449, 451.

### B.      Presidential Records Act

Several years later, Congress passed the Presidential Records Act of 1978 ("PRA"), which addressed this issue of public access to presidential papers in a broader context.  In keeping with the view that presidential records are not personal property, the Act states that "[t]he United States shall reserve and retain complete ownership, possession, and control of Presidential records; and such records shall be administered in accordance with this chapter."  44 U.S.C. § 2202.  The Act confers on the Archivist of the United States "responsibility for the custody, control, and preservation of, and access to, the Presidential records" generated during the outgoing president's term or terms.  44 U.S.C. § 2203(f)(1).  It further directs that the "Archivist shall have an affirmative duty to make such records available to the public as rapidly

and completely as possible consistent with the provisions of this Act." *Id.*  In conjunction with

this mandate, the PRA makes several provisions for the restriction of access to presidential

records.[4]

---

[4]  In August 2001, in anticipation of the expiration of the restrictions on former President Reagan's records, the Archivist publicly addressed the procedures governing the opening of presidential records under the PRA:

> The PRA also establishes a process for access to the records of Presidents from Ronald Reagan onwards. It allows public access to the records beginning five years after the President leaves office, but permits the former President and the Vice President to invoke up to six specific restrictions to public access for up to twelve years.

> For the first five years after the President leaves office, his records are generally exempt from public access of any kind, including the Freedom of Information Act (FOIA). During this period, only Congress, the courts, and the incumbent and former Presidents may have access.

> For the next seven years, anyone can request access to Presidential records through the Freedom of Information Act (FOIA), but various exemptions under the PRA and FOIA still apply. The PRA exemptions include national security information that is properly classified; information about appointees to Federal office; information specifically exempt from disclosure by law; trade secrets and confidential business information; confidential communications requesting or submitting advice between the President and his advisors or between such advisors; and information which, if disclosed, would cause a clearly unwarranted invasion of personal privacy. These exemptions are imposed by the Archivist, following a thirty-day review by both the former and current Presidents.

> After twelve years, the PRA exemptions no longer apply. Only the FOIA exemptions apply at that point, except one: there is no longer an automatic statutory exemption to withhold communications between the President and his advisors and among the advisors themselves or any other deliberative records. However, even after twelve years, both the former and current Presidents still review Presidential records prior to release to consider whether to assert the privilege that covers communications between the President and his advisors and among the advisors themselves, or any other deliberative records. Executive Order 12667, issued by President Reagan in January 1989, establishes the procedures for notifying the former and incumbent Presidents and for asserting that privilege against the release of Presidential records.

Pls.' Renewed Mot. for Summ. J. Attach. 5.  *See also* John W. Carlin, *Opening the Reagan Records* (August 2001), *at* http://www.archives.gov/presidential-libraries/laws/access/reagan.html(last visited September 6,

First, prior to leaving office, a president can restrict access to certain categories of information for up to 12 years. *Id.* § 2204(a)(1)-(6).  In relevant part, the PRA allows a president to restrict access to "confidential communications requesting or submitting advice, between the President and his advisers, or between such advisors" for twelve years. *Id.* § 2204(a)(5).[5]

Second, records not restricted for the twelve-year period, shall be made available by the Archivist to the public after five years, generally subject to the conditions of the Freedom of Information Act, 5 U.S.C. § 552.[6]  44 U.S.C. §§ 2204(b)(2)(A), 2204(c)(1).  Each of these FOIA exemptions may apply to presidential records indefinitely.[7]  As to the applicability of FOIA exemptions, the one exception to this direction is that presidential records cannot be withheld from members of the public based on FOIA exemption (b)(5).  44 U.S.C. § 2204(c)(1).  In the

---

2005).

[5]The other categories of information are: classified materials related to national defense or foreign policy, 44 U.S.C. § 2204(a)(1); materials "relating to appointments to federal office," *id.* § 2204(a)(2); information "specifically exempted from disclosure by statute," *id.* § 2204(a)(3); privileged or confidential trade secrets and commercial or financial information, *id.* § 2204(a)(4); and information "the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." *Id.* § 2204(a)(6).  Purely personal documents are excluded from the PRA's definition of "Presidential records," *id.* § 2201(2)(B)(ii).

[6]Four of the exemptions from access are the same as categories to which a president may delay access for 12 years.

[7]The exemptions are: national security information, 5 U.S.C. § 552(b)(1); information on internal personnel matters, *id.* § 552(b)(2); information statutorily exempted from disclosure, *id.* § 552(b)(3); privileged or confidential "trade secrets and commercial or financial information," *id.* § 552(b)(4); information "the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," *id.* § 552(b)(6); certain types of "[r]ecords or information compiled for law enforcement purposes," *id.* § 552(b)(7); information used by "an agency responsible for the regulation or supervision of financial institutions," *id.* § 552(b)(8); and "geological and geophysical information and data, including maps, concerning wells," *id.* § 552(b)(9).

ordinary FOIA context, the public is not entitled to materials that fall under exemption (b)(5), "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  In the context of presidential records, however, the (b)(5) exemption is inapplicable, so such materials are considered records belonging to the National Archives, and must be "granted on nondiscriminatory terms" to members of the public.  44 U.S.C. § 2204(c)(1).

Third, the PRA states that "[n]othing in this Act shall be construed to confirm, limit, or expand any constitutionally-based privilege which may be available to an incumbent or former President." *Id.* § 2204(c)(2).

Under the PRA, the Archivist must notify the former president "when the disclosure of particular documents may adversely affect any rights and privileges which the former President may have." *Id.* § 2206(3).  The National Archives and Records Administration ("NARA") has implemented this requirement by promulgating a regulation providing that whenever the Archivist intends to make public any presidential record, he must provide 30 days' notice to the former president to allow him, or his designated representative, to assert any rights or privileges that would foreclose access to the materials.  36 C.F.R. § 1270.46(a), (b), (d).  If the former president raises such a right or privilege intending to preclude disclosure, "and the Archivist nevertheless determines that the record in question should be disclosed in whole or in part, the Archivist shall notify the former President or his representative," and "shall not disclose [the records] for at least 30 calendar days . . ." *Id.* § 1270.46(c), (d).  Copies of either notice to a former president of impending disclosure must be provided to the incumbent president as well.

*Id.* § 1270.46(e).

### C.   Executive Order 12,667

President Ronald Reagan signed Executive Order 12,667 ("Reagan Order") on January 18, 1989, "in order to establish policies and procedures governing the assertion of Executive privilege by incumbent and former Presidents in connection with the release of Presidential records" by NARA under the PRA.  Reagan Order, 54 Fed. Reg. 3403; *see also* 44 C.F.R. § 2204 note.  The Reagan Order specified three situations in which presidential records could be withheld:  national security, law enforcement, and the executive deliberative process privilege, and gave the incumbent president the authority to assert privilege over the records of a former president.  *Id.* §§ 1(g), 3.

When the Archivist notified an incumbent and former president of his intent to open records, the Reagan Order required him to "identify any specific materials, the disclosure of which he believes may raise a substantial question of Executive privilege."  *Id.* § 2(a).  After 30 days, the Archivist would be free to disclose the records, "unless during that time period the Archivist [received] a claim of Executive privilege by the incumbent or former President or the Archivist has been instructed by the incumbent President or his designee to extend the time period."  *Id.* § 2(b).  The Reagan Order provided that both the incumbent and former presidents could assert executive privilege, but that the Archivist would only be bound to accept the privilege claim of an incumbent president.  *Id*. §§ 3-4.  The Reagan Order required the Archivist to abide by an incumbent president or his designee's direction as to whether to accept or deny a former president's claim of privilege, unless ordered otherwise by a court.  *Id.* § 4.

The Reagan Order was revoked by Executive Order 13,233, as discussed *infra*.

**D.     Executive Order 13,233**

**1.     Factual Backdrop for Executive Order 13,233**

The records generated during President Reagan's terms in office were the first to be subject to the provisions of the PRA.  Before leaving office, President Reagan exercised his right under the PRA to restrict appropriate materials for the maximum 12 year period, including "confidential communications" with his advisors.  Compl. ¶ 26.  President George W. Bush took office in January 2001, the same time that President Reagan's 12 year restrictions on certain records expired, and in February 2001, NARA notified President Bush and former President Reagan that it intended to release these materials because the period of their restriction had expired.  Compl. ¶¶ 27, 33.  The notice did not state that any records "raise a substantial question of Executive privilege" within the meaning of § 2(a) of the Reagan Order.  Compl. ¶ 33.

In response to NARA's notice, then-White House Counsel Alberto R. Gonzales twice instructed the Archivist to extend the time available for President Bush to review the soon-to-be-released presidential records, for a total extension of 180 days.  Compl. ¶ 36; Pls.' Stmt. of Undisputed Facts in Support of Pls.' Renewed Motion for Summ. J. ("Pls.' Stmt. #1") Ex. 2, 3.  At the end of the 180 days, White House Counsel Gonzales instructed the Archivist to extend the time for White House review for "a few additional weeks," stating that the extended review period "has been necessary for this Administration to review the many constitutional and legal questions raised by potential release of sensitive and confidential Presidential records, and to decide upon the proper legal framework and process to employ in reviewing such records on an

ongoing basis." Pls.' Stmt. #1 Ex. 4; Def. Resp. to Pls.' Stmt. #1 ¶ 1.

On November 1, 2001, President Bush issued Executive Order 13,233 ("Bush Order" or

"EO 13,233"), entitled "Further Implementation of the Presidential Records Act."  Bush Order,

66 Fed. Reg. 56025; *see also* 44 U.S.C. § 2204 (Supp. 2003).  The stated purpose of the Bush

Order is "to establish policies and procedures implementing [the Presidential Records Act] with

respect to constitutionally based privileges . . ."  *Id.* preamble.  The order "is not intended to

indicate whether and under what circumstances a former President should assert or waive any

privilege.  The order is intended to establish procedures for former and incumbent Presidents to

make privilege determinations."  *Id.* § 9.

### 2.      Stated Constitutional and Legal Background for Executive Order 13,233

Section 2 of the Bush Order details the order's constitutional and legal background.  *Id.* §

2.  After the 12-year period during which a former president's records can be shielded from

public view, the PRA directs the Archivist to follow the FOIA guidelines when releasing

presidential records.  *Id.* § 2(a).  While the PRA explicitly states that FOIA exemption (b)(5) is

not a permissible basis on which the Archivist may withhold documents from the public after the

12-year period has elapsed, *see* 44 U.S.C. § 2204(c)(1), the Bush Order states that 44 U.S.C. §

2204(c)(2) "recognizes that the former President or the incumbent President may assert any

constitutionally based privileges, including those ordinarily encompassed within [FOIA

exemption (b)(5)]."  Bush Order § 2(a).

The Bush Order includes a detailed description of what purportedly constitutes a

president's constitutionally-based privilege.  The Bush Order removed the privilege for law

enforcement records, and added several categories instead:

> The President's constitutionally based privileges subsume privileges for records that reflect:  military, diplomatic, or national security secrets (the state secrets privilege); communications of the President or his advisors (the presidential communications privilege); legal advice or legal work (the attorney-client or attorney work product privileges); and the deliberative processes of the President or his advisors (the deliberative process privilege).

*Id.*  In addition, the Order states that the executive exercise of a constitutionally-based privilege does not expire simply due to the passage of time, relying on *Nixon v. Administrator*, which held that "constitutionally based privileges available to a President 'survive[] the individual President's tenure.'"  *Id.* § 2(b) (quoting *Nixon v. Administrator*, 433 U.S. at 449).

The order also maintains that "a former President, although no longer a Government official, may assert constitutionally based privileges with respect to [his records], and [the Supreme Court] expressly rejected the argument that 'only an incumbent President can assert the privilege of the Presidency.'"  *Id.* (quoting *Nixon v. Administrator*, 433 U.S. at 448).  Finally, the Bush Order sets out a standard that those requesting presidential documents must meet.  As opposed to the FOIA standard, which requires no showing of need for the information sought, the Bush Order requires a "'demonstrated, specific need' for particular records, a standard that turns on the nature of the proceedings and the importance of the information to that proceeding."  *Id.* § 2(c), quoting *United States v. Nixon*, 418 U.S. 683, 713 (1974).

### 3.    Procedures Under the Bush Order

The Bush Order sets out several procedures for the Archivist when administering presidential records.  When the Archivist receives a request for unreleased presidential records, the Bush Order requires the Archivist to notify both the former president and incumbent

president, and provides them with the records sought.  Bush Order § 3(a).  The Archivist may not

release the records while the former president reviews them.  *Id.* § 3(b).  The incumbent president

or his designee has the concurrent ability to determine whether to invoke executive privilege with

respect to the records.  *Id.* § 3(d).  If the former president requests that the records be withheld as

privileged, and the incumbent president concurs in the former president's decision, the

incumbent president informs the former president and the Archivist of his agreement.  *Id.* §

3(d)(1)(I).

The Bush Order also permits former presidents to raise the executive privilege, even in

the face of disagreement by the incumbent president, and permits the incumbent to raise the

privilege with respect to a former president's papers, even if the former president does not raise

the privilege himself.  *Id.* §§ 3(d)(1)(ii), 3(d)(2)(ii).  The Bush Order indicates that the incumbent

president will concur in the former president's privilege decision "[a]bsent compelling

circumstances."  *Id.* § 4.  The Archivist may not disclose the records until the incumbent

president informs the Archivist that both he and the former president agree to permit access, "or

until ordered to do so by a final and nonappealable court order."  *Id.* § 3(d)(1)(I); *see also id.* §§

3(d)(1)(ii), 3(d)(2)(I), 3(d)(2)(ii).

Finally, the Bush Order maintains that the records of a former vice president are to be

administered with the same procedures as those of a former president, and that both the PRA and

the Bush Order apply to vice presidential records in the same manner as they would apply to

presidential records.  *Id.* § 11.

### E.    Procedural History and Records Sought

When Plaintiffs originally brought this suit, some 68,000 pages of former President

Reagan's records were under review by former President Reagan and President Bush.  Compl. ¶¶

53-55.  Over the course of this litigation, various records have been released while new records

have come to light.  The 68,000 pages that were originally the subject of Plaintiffs' complaint

were fully released.  Compl. ¶ 55.  Plaintiffs requested additional records, which were also

released.  *See* Pls.' Resp. to Def. "Notice with Respect to Processing Records" at 5 (stating that

Plaintiffs had an outstanding request for 1,654 pages and 15 minutes of videotape); *see also* Def.

Further Notice with Respect to Processing of Records ("Def. Further Notice") at 1 (notifying the

Court that the video segment and all but seventy four pages of the 1,654 pages were authorized

for release).  On January 12, 2004, the White House Counsel's Office notified NARA that

President Bush "asserts constitutionally based privilege in concurrence with former President

Reagan's assertion" over seventy four pages of former President Reagan's records.  Def. Further

Notice Attach. A (Gonzales Letter).

On March 28, 2004, the Court dismissed this suit on justiciability grounds.  However, on

April 12, 2004, Plaintiffs filed a motion to alter or amend the judgment, pursuant to Federal Rule

of Civil Procedure 59(e).  Plaintiffs presented the Court with two facts that had been omitted

from the parties' earlier briefs:  Plaintiffs informed the Court that they have outstanding requests

for presidential records, and that they intended to raise a challenge to the presidents' assertion of

privilege over the seventy four pages of records.[8]  *See* Pls.' Mot. to Alter or Amend J. at 4-5.

---

[8]Administrative remedies with respect to those seventy four pages had not been exhausted until April 1, 2004.  Pls.' Mot. to Alter or Amend J. at 5.

The Court gave Plaintiffs leave to file an amended complaint, adding a challenge to the withholding of the seventy four pages.  Plaintiffs filed this First Amended Complaint on July 2, 2004, including the additional claim as Count II.  The parties filed a joint stipulation on July 13, 2004, in which they set forth the posture of this case.  With respect to Count I, Plaintiffs' challenge to the implementation of Executive Order 13,233, the parties agreed to renew Defendants' original motion to dismiss and Plaintiffs' original motion for summary judgment.[9]  With respect to Count II, Plaintiffs' challenge to the withholding of the seventy four pages pursuant to Executive Order 13,233, the parties agreed to file cross motions for summary judgment.

Plaintiffs filed their motion for summary judgment on Count II on August 19, 2004, addressing the eleven documents, comprising seventy four pages of materials, that were withheld after President Reagan's representative asserted executive privilege over them.  *See* Pls.' Mot. for Summ. J. Count II at 1.  Defendants filed their motion for summary judgment and opposition to Plaintiffs' motion on September 17, 2004.  In that filing, Defendants informed the Court and Plaintiffs that two of the eleven documents had been released, and that after a further review of the documents, President Bush had issued a "separate" assertion of the presidential communications privilege pursuant to the PRA "that is not dependent on President Reagan's assertion," over the remaining nine documents.  Defs.' Mot. for Summ. J. Count II Ex. B (Gonzales Dec.) ¶ 7.

In their reply and opposition to Defendants' motion, Plaintiffs explained that this

---

[9]As indicated, the Court will resolve these motions separately.

"'separate' assertion of privilege means that Public Citizen's claim for access to the remaining documents, which is the sole subject of these cross-motions on Count Two of the Amended Complaint, no longer turns on the legality of the challenged features of the Executive Order," but instead now "concern[] whether nine documents from the Reagan White House, ranging in age from 16 to 18 years, remain subject to a constitutional claim of presidential privilege despite the passage of so many years since they were written." Pls.' Reply and Opp. Summ J. Count II at 2. In response to this factual development, Plaintiffs argue that the "constitutional claim of presidential privilege" fails to take into account "the proposition that the privilege erodes over time." *Id*. at 2-3. Defendants argue that Plaintiffs have not presented any special need for these documents that should override the president's assertion of the presidential communications privilege. Defs.' Reply Summ. J. Count II at 1.[10]

## III.    Legal Standard

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

---

[10]With the passage of time, the issues have narrowed such that these are the only remaining issues ripe for discussion on Count II. Plaintiffs make cursory justiciability arguments in their opposition to Defendants' motion and reply in support of their own motion. *See* Pls.' Reply and Opp. Summ J. Count II at 2 n.1. However, any justiciability arguments are more appropriately considered as part of Count I, which the Court will address in a separate opinion.

(1986).  The adverse party's pleadings must evince the existence of a genuine issue of material fact.  *See id.* at 247-48.  To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficiently admissible evidence such that a reasonable trier-of-fact could find for the nonmoving party.  *See id.*; *Laningham v. United States Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987).  Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment.  Rather, the nonmoving party bears the affirmative duty to present, by affidavits or other means, specific facts showing that there is a genuine issue for trial.  *See id.* at 1248-49.  The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## IV.  Discussion

With respect to Count II of Plaintiffs' claims, Plaintiffs seek access to documents from President Reagan's tenure over which President Bush has asserted constitutional executive privilege.  The Court considers whether Plaintiffs must demonstrate a special need for the documents in order to overcome the president's assertion of privilege or whether no such heightened showing is required, and whether the passage of time since these documents were created erodes the strength of the presidential privilege such that Plaintiffs are now entitled to these documents.

Defendants rely on a number of cases dealing with presidential records for their argument that Plaintiffs must show some special need for the documents in order to overcome the

assertions of constitutional privilege.  The Court examines these precedents, finding that such a showing of need is required.  The PRA reflects a balance between the public's interest in viewing presidential materials and a president's interest in restricting access to certain materials for a period of time.  Indeed, the language of the PRA provides access under FOIA to presidential records that a president may have restricted from public release for twelve years, while simultaneously stating that none of the PRA's provisions "shall be construed to confirm, limit, or expand any constitutionally based privilege which may be available to an incumbent or former President."  44 U.S.C.  § 2204(c)(2).

Although the cases available for the Court to draw on deal generally with document requests in the discovery context, the Court nevertheless finds the reasoning in these cases instructive.  In *United States v. Nixon*, 418 U.S. 683 (1974) ("*Nixon I*"), the Supreme Court considered whether a special prosecutor in a criminal proceeding was entitled to subpoenaed documents over which then-sitting President Richard Nixon had asserted  executive privilege. The Court found that neither separation of powers, nor the president's generalized need for confidentiality supported a finding that the president's assertion of privilege protected the records from disclosure in all circumstances, and that the prosecutor's showing of need for evidence in a pending criminal trial was sufficient to merit disclosure of the records.  *See generally id.* at 703-13.  In determining that the subpoena should not be quashed, however, the Supreme Court's decision rested on the premise that the prosecutor's demonstrated need for the documents, and the lower court's need for the documents in order to conduct its judicial functions were interests that were sufficiently compelling to justify the overriding of the president's assertion of

17

constitutional privilege.  *Id*. at 698.  Indeed, the Court held that "[t]he generalized assertion of privilege must yield to the demonstrated, specific need for evidence in a pending criminal trial." *Id*. at 713.

    *Nixon I* was followed by a related Supreme Court decision in *Nixon v. Administrator of General Services*, 433 U.S. 425 (1997) ("*Nixon II*"), in which President Nixon challenged the Presidential Recordings and Materials Preservation Act as unconstitutional because it infringed on the presidential privilege.  The Supreme Court held that a former president could assert the privilege over his own records, but that such an assertion carried less weight than an assertion by an incumbent over his own presidential records.  *Id*. at 449.  The Court found that the Act's provision for screening of the privileged materials by government archivists constituted only a limited intrusion on the confidentiality of presidential communications, and that the intrusion was justified in light of the significant public interests served by the Act.  *Id*. at 450-55.  The United States Court of Appeals for the District of Columbia Circuit has stated that "[t]he *Nixon* cases establish the contours of the presidential communications privilege" of an incumbent president's assertion of constitutional privilege over his own papers, explaining that "[t]he President can invoke the privilege when asked to produce . . . materials that . . . the President believes should remain confidential.  If the President does so, the documents become presumptively privileged."  *In re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997).  The privilege, however, is not unqualified or absolute; rather, it "can be overcome by an adequate showing of need."  *Id*. at 745.

    The Supreme Court discussed its earlier *Nixon I* holding in a recent case, *Cheney v.*

*United States District Court for the District of Columbia*, 542 U.S. 367, 124 S.Ct. 2576 (2004).

In *Cheney*, the Court considered discovery requests seeking documents from the incumbent vice

president and several other presidential advisors.  *Cheney* concerned document requests in the

context of a civil suit, and the Court compared the circumstances with its earlier holding in *Nixon*

in the criminal context.  The Court noted that, while withholding necessary materials in an

ongoing criminal case constitutes an impermissible impairment of another branch's essential

functions, the same could not be said of document requests in the civil contexts.  *Id*. at 2588

("[U]nlike this case, which concerns respondents' requests for information for use in a civil suit,

*Nixon* [*I*] involves the proper balance between the Executive's interest in the confidentiality of its

communications and the 'constitutional need for production of relevant evidence in a criminal

proceeding.'" (quoting *Nixon I*, 418 U.S. at 713).  In rejecting the lower court's holding that the

executive branch must assert particularized privilege over records before its separation of powers

arguments could be considered, the Court reiterated the view that "special considerations control

when the Executive Branch's interests in maintaining the autonomy of its office and safeguarding

the confidentiality of its communications are implicated."  *Id*. at 2589.  The Court in *Cheney*

recalled that in *Nixon I*, the sitting president could not withhold information in the face of

subpoenas based on "the assertion of a 'broad [and] undifferentiated' need for confidentiality and

the invocation of an 'absolute, unqualified' executive privilege."  *Id*. at 2591 (quoting *Nixon I*,

418 U.S. at 706, 707).  However, the *Cheney* Court noted that the Court in *Nixon I* had reached

that conclusion "only after the party requesting the information . . . had satisfied his burden of

showing the propriety of the requests."  *Id*.

19

Both of these Supreme Court cases indicate that a president's assertion of constitutional privilege can only be overcome with some "demonstrated, specific need" on the part of the party seeking the privileged documents.  This reasoning also appears in cases decided by the Court of Appeals for the District of Columbia Circuit.  In *Dellums v. Powell*, 561 F.2d 242 (D.C. Cir. 1977), the Court of Appeals held that an adequate showing of need in a civil trial would defeat the president's invocation of constitutional privilege where the civil action involved allegations that government officials had conspired to deprive citizens of constitutional rights, and there had been a sufficient evidentiary showing to overcome any concern that the request for materials was frivolous.  *Id.* at 247.  In *In re Sealed Case*, the Court of Appeals considered a subpoena issued by a grand jury seeking documents over which the White House Counsel's office exercised presidential communications privilege.  The Court of Appeals stated that "while both the deliberative process privilege and the presidential privilege are qualified privileges, the *Nixon* cases suggest that the presidential communications privilege is more difficult to surmount," and that "a party seeking to overcome the presidential privilege seemingly must always provide a focused demonstration of need . . . ."  *In re Sealed Case*, 121 F.3d at 746.  Discussing the standard of need, the Court of Appeals found that "[i]t would be strange indeed if *Nixon* required nothing more to overcome presidential privilege than the initial showing of relevancy, admissibility and specificity necessary to satisfy Rule 17(c) [for subpoenas] in all cases, even in cases where no claim of privilege is raised" because "[i]f this were true, the privilege would have no practical benefit."[11]  *Id.* at 754.

---

[11]Ultimately, the Court of Appeals found that the "demonstrated, specific need" standard in the subpoena context required,"first, that each discrete group of the subpoenaed materials

Although the cases address requests for materials in the form of subpoenas, the Court finds it reasonable that the "special considerations," *see Cheney*, 124 S.Ct. at 2589, due where the incumbent president has asserted constitutional privilege over his own records apply outside the context of a subpoena as well.  The Supreme Court and the Court of Appeals for this circuit have demonstrated that the president's invocation of constitutional privilege affords meaningful, additional protection to the materials sought. Even in the context of criminal prosecution, where a defendant's rights are acutely at stake, the Supreme Court has held that the party seeking privileged materials must demonstrate a specific need for the materials before the privilege can be deemed outweighed.  *See Nixon I*, 418 U.S. at 713 ("The generalized assertion of privilege must yield to the demonstrated, specific need for evidence in a pending criminal trial.").

More to the point, the Court of Appeals found it unreasonable that a party could obtain constitutionally privileged materials by subpoena, having only met the basic standard that would be applicable to a subpoena request for any unprivileged document; to find as much would be tantamount to finding that the privilege carried no weight at all and offered no additional layer of protection to the covered documents.  *See In re Sealed Case*, 121 F.3d at 754.  The same is true in the present context.  If this Court were to find that no heightened showing of need were required of Plaintiffs in their quest for the remaining documents over which President Bush has asserted a constitutional privilege, then Plaintiff could obtain those documents simply by meeting the ordinary FOIA standard, which requires no showing of need.  This would amount to a finding that the president's assertion of a constitutional privilege has "no practical benefit," which

---

likely contains important evidence; and second, that this evidence is not available with due diligence elsewhere."  *In re Sealed Case*, 121 F.3d at 754.

"would be strange indeed . . . ." *Id*.

Plaintiffs have presented no argument or case law suggesting that the Court's view is incorrect.  Plaintiffs' primary argument to the contrary is that Congress did not intend for the presumption in favor of executive privilege to persist beyond the initial twelve years set forth in the PRA.[12]  Plaintiffs take issue with Defendants' "assertion that a provision stating only that '[n]othing in this Act shall be construed to *confirm, limit, or expand* any constitutionally-based privilege which may be available to an incumbent or former President,' somehow 'expressly preserved the presumption in favor of the confidentiality of presidential papers' even beyond the 12-year restriction period," claiming that such an interpretation "is a distortion of the statute's meaning."  Pls.' Reply in Support of Mot. for Summ. J. Count II at 9-10 (citations omitted, emphasis added in Plaintiffs' brief).  Rather, Plaintiffs argue that "[t]he statute's language only reflects Congress'' understanding that it could not definitively put limits on a constitutional privilege."  *Id*.  The Court finds Plaintiffs' position unpersuasive.  Plaintiffs suggest that "Congress provided that the PRA did not 'limit' any constitutionally based privilege that might survive the 12-year period because the failure to include such a provision could have endangered the constitutionality of the legislation."  *Id*. at 9.  Without delving into congressional intent, the Court is not persuaded by Plaintiffs' suggestion that the PRA's explicit language has no bearing

---

[12]Plaintiffs also cite to *Nixon v. Freeman*, 670 F.2d 346 (D.C. Cir. 1982), in support of their argument that no showing of particularized need is required.  *See* Pls.' Reply in Support of Mot. for Summ. J. Count II at 8-9.  However, *Freeman*, held that individuals seeking access to former President Nixon's White House audio tapes did not have to show particularized need before President Nixon had asserted executive privilege over the tapes.  In the instant case, executive privilege has been asserted by an incumbent president, and accordingly the *Freeman* decision is factually distinct and does not alter this Court's findings.

on the question at hand.  Rather, the PRA's language providing that none of the PRA's provisions "shall be construed to confirm, limit, or expand any constitutionally based privilege which may be available to an incumbent or former President," 44 U.S.C.  § 2204(c)(2), permits the president to exercise his constitutionally-based privilege in a manner unchanged by the language of the PRA.  The Court will not read a twelve year restriction on the president's constitutionally-based privilege where Congress has expressly refused to do so.[13]

Having found that Plaintiffs must show some "demonstrated, specific need " for the records they seek in order to overcome the president's assertion of constitutional privilege, the inevitable result is that summary judgment must be granted for Defendants and against Plaintiffs. Plaintiffs have conceded that they are not in a position to make any such showing, because Plaintiff "Public Citizen does not assert that it has any more 'need' for the documents than any other requester."  Pls.' Reply in Support of Mot. for Summ. J. Count II at 5.  In light of the fact that Plaintiffs have conceded that they can make no required showing of need, the Court does not address their argument that the strength of the president's constitutional privilege diminishes over time.

**V.    Conclusion**

With respect to Count II of Plaintiffs' Complaint, the Court finds that Defendants' motion

---

[13]Plaintiffs briefly suggest that they dispute the appropriateness of President Bush's assertion of privilege over the remaining nine documents.  *See* Pls.' Reply and Opp. Summ J. Count II at 10-11.  However, Plaintiffs' argument is essentially that the president has in the past chosen to release other documents similar to the ones now withheld.  Plaintiffs do not in fact challenge Defendants' assertion that these documents address issues discussed and developed to advise the president, and they do not dispute Alberto Gonzales' statement that these documents "are protected by the presidential communications prong of the President's constitutionally based privilege."  Defs.' Mot. for Summ. J. Count II Ex. B (Gonzales Dec.)  ¶ 4.

for summary judgment shall be granted and Plaintiffs' motion for summary judgment shall be denied.

In addition, the Court shall grant Plaintiffs' Motion to Alter or Amend the Judgment with respect to Count I. The factual clarifications provided by Plaintiffs requires a reexamination of the Court's grounds for decision on Count I. However, as a practical matter, at the point that Plaintiffs filed these factual clarifications, the arguments surrounding justiciability of Plaintiffs' facial challenge to Executive Order 13,233 had shifted and changed. Furthermore, as the briefing with respect to Count II makes clear, the justiciability arguments have shifted even further, requiring briefing that accurately reflects the current status. Rather than proceed to interpret various pieces of various briefs, which do not reflect the current status of the issues and facts, the Court shall require the parties to file one set of cross motions with respect to Count I. The parties are of course free to draw upon any earlier briefs in developing this final set of motions. However, the Court expects that these motions and the attendant briefs will stand on their own, without reference to any earlier filings in this case.

An appropriate Order accompanies this Memorandum Opinion.

/s/
_____
COLLEEN KOLLAR-KOTELLY
United States District Judge
